MASON ET AL. v. UNITED STATES.

EUBANK ET AL v. UNITED STATES.

MacMULLEN ET AL. v. UNITED STATES.

MATTHEWS ET AL. v. UNITED STATES.

HUNSICKER ET AL. v. UNITED STATES.

NORVELL ET AL. v. UNITED STATES.

PALMER ET AL. v. UNITED STATES.

ARKANSAS NATURAL GAS COMPANY ET AL. v. UNITED STATES.

APPEALS FROM THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

Nos. 117, 115, 116, 114, 104, 113, 111, and 112.   Argued November 17, 20, 1922.—Decided January 2, 1923.

1. The order of December 15, 1908, whereby, to conserve the public interests and in aid of contemplated legislation, specified public lands in Louisiana were " withdrawn from settlement and entry, or other form of appropriation," was within the power of the Executive. P. 553.  *United States* v. *Midwest Oil Co.*, 236 U. S. 459.
2. The words " other form of appropriation " in this order include appropriations by mining locations.  P. 553.
3. The *ejusdem generis* rule is a rule of construction resorted to only as an aid in ascertaining the meaning of doubtful words and phrases; it will not be so employed as to render general words in a statute meaningless by assigning them to a genus fully occupied by the specific terms employed.  P. 553.
4. Defendants who entered upon parcels of the withdrawn lands under mining locations, and extracted oil, in " moral good faith," in the honest though mistaken belief that the order of withdrawal was void, were liable in damages under the laws of Louisiana, only for the value of the oil taken after deducting the cost of drilling,

45646°—23——35

and equipping and operating the wells by means of which it was extracted. P. 555.

5. A specific finding of fact, made by a master after seeing and hearing the witnesses, and supported by evidence, will be accepted here. P. 556.

6. Location of one hundred and sixty acres of oil land by an association of eight persons and lease of the tract on the same day to a corporation, in pursuance of an understanding had prior to the location, is not fraudulent under the federal mining laws. P. 557.

7. A general rule of state statutory law for measuring damages in cases of conversion is binding on the federal courts sitting in the State, in suits in equity involving title to land there situate and seeking to restrain continuing trespasses upon it, in which damages for conversion of oil wrongfully extracted from the land are claimed as an incident to the equitable relief. P. 557.

8. The enforcement of such a statute in an equity suit does not trammel or impair the equity jurisdiction of the federal courts. P. 558.

9. Revised Statutes, § 721, providing that the laws of the States shall be rules of decision in trials at common law in the courts of the United States, is merely declarative of the rule that would exist in its absence, and does not by implication exclude such laws as rules of decision in equity suits. P. 558.

10. Where some of a number of joint trespassers extract oil from land (in Louisiana) and pay royalties thereon to the others who share none of the cost of mining, all are liable to the land owner for the amount of the royalties without any deduction of expenses; but a decree against all for the royalties and against the operating trespassers for the net proceeds of the oil extracted, in so far as it allows a double recovery of the royalties, is erroneous. P. 559.

273 Fed. 135, 142, reversed.

APPEALS from decrees of the Circuit Court of Appeals, affirming with modifications decrees of the District Court in suits brought by the United States to confirm its title to various tracts of public land in Louisiana, to restrain continuing trespasses and to secure accountings for the value of oil and gas wrongfully extracted.

*Mr. R. L. Batts* and *Mr. S. L. Herold,* with whom *Mr. D. Edward Greer, Mr. Hampden Story, Mr. J. A. Thigpen* and *Mr. E. P. Lee* were on the briefs, for appellants.

*Mr. Assistant Attorney General Riter,* with whom *Mr. Solicitor General Beck* and *Mr. H. L. Underwood* were on the brief, for the United States.

The withdrawal order contemplated and had the effect of withdrawing the lands from mining location.

The damages were properly fixed upon the basis of wilful trespasses.

It is undisputed that appellants knew of the withdrawal order and that they went upon the lands well aware that the Government authorities had declared that no claims could be initiated thereon. In the face of this warning, they cannot claim to be innocent trespassers. *Goodson* v. *Stewart,* 154 Ala. 660; *Chilton* v. *Missouri Lumber Co.,* 144 Mo. App. 315.

Their acts were clearly wilful and intentional, done with the purpose to ignore and defy the withdrawal order, and they knew that they were speculating upon the validity of that order. They did not mistake the facts but the law. A mistake of law does not lessen their liability nor make them innocent trespassers. *United States* v. *Murphy,* 32 Fed. 376.

That a mistake of law is not a defense against a charge of wilful trespass is also established by the decisions in *Guffey* v. *Smith,* 237 U. S. 101, and *Benson Mining Co.* v. *Alta Mining Co.,* 145 U. S. 428. These cases we think controlling and decisive in the cases at bar. To the same effect is *Union Naval Stores Co.* v. *United States,* 240 U. S. 284. Cf. *Pine River Logging Co.* v. *United States,* 186 U. S. 279.

*Durant Mining Co.* v. *Percy Mining Co.,* 93 Fed. 166, and *United States* v. *Van Winkle,* 113 Fed. 903, proceed upon the theory that the mistake was one of fact.

Erroneous advice of counsel in the face of knowledge of an asserted adverse claim is not a defense in cases such as these. *Central Coal & Coke Co.* v. *Penny,* 173 Fed. 340; *Chilton* v. *Missouri Lumber Co., supra.*

In *United States v. Homestake Mining Co.,* 117 Fed. 481, the mining company consulted with the Secretary of the Interior with reference to cutting the timber involved, made a verbal agreement with that official as to the cutting and the price, and proceeded thereunder. Here, the appellants proceeded without consulting any official and in defiance of the order withdrawing the lands.

As the appellants were wilful trespassers, the measure of damages is the value of the oil and gas in the pipe line when sold, without deduction for extraction. *Wooden-ware Co. v. United States,* 106 U. S. 432; *Guffey v. Smith, supra.*

But if innocent, the appellants would not be entitled to allowance of cost of drilling. *United States v. Midway Northern Oil Co.,* 232 Fed. 619; *United States v. Mc-Cutchen,* 238 Fed. 575; *St. Clair v. Cash Gold Mining Co.,* 9 Colo. App. 235; *Hall v. Abraham,* 44 Oreg. 477.

It is, however, to be borne in mind that not all of the defendants sought the advice of counsel, and accordingly the defense of good faith is not open to them.

In an action for malicious prosecution, where both malice and want of probable cause must be shown, the defendant is, of course, permitted to show that he sought the advice of counsel in order to prove the existence of probable cause. *Stewart v. Sonneborn,* 98 U. S. 187. But testimony of this sort is unavailing if the proof shows that the advice was sought colorably. 18 L. R. A. (N. S.) 62.

The same reasoning applies in a suit of this sort. In this case the Court of Appeals in effect found that the locators did not seek legal advice in good faith, but for an ulterior purpose. Its finding ought not to be disturbed. *Lawson v. United States Mining Co.,* 207 U. S. 1.

The location involved in the Norvell case is inherently bad. The location was fraudulent, of which the defendants not only had notice, but all of them actively participated in the fraud. That the location was made for the

benefit of the Gulf Refining Company is apparent. The general manager of the Gulf Refining Company approached the president of the First National Bank, telling him that there was a tract of vacant government land in Louisiana supposed to contain oil; that he had been advised that the company could locate only twenty acres; that his company was taking up oil lands in that vicinity; and that if the president of the bank and his friends would locate the land the company would lease or buy it. On the very day the location was filed the parties who participated in it, consisting of the officers and employees of the bank, executed a contract with the oil company for the operation of the land. Under this contract the so-called locators were to receive $500 each in the event the land proved to be oil land. The locators had not seen the land, nor did they themselves take part in locating it, but they appointed an agent, also an employee of the Gulf Refining Company, to make the location for them

The placer mining laws, which were extended to lands containing petroleum by the Act of February 11, 1897, 29 Stat. 526, provide that locations of not more than 160 acres each by two or more persons, or association of persons, having contiguous claims, are permitted, there being a proviso to the effect that " no such location shall include more than 20 acres for each individual claimant." Rev. Stat. § 2331.

This limitation upon the number of acres one individual may locate necessarily means something, hence " any scheme or device entered into whereby one individual is to acquire more than that amount or proportion in area constitutes a fraud upon the law, and consequently a fraud upon the Government." *Nome & Sinook Co.* v. *Snyder,* 187 Fed. 385; *Cook* v. *Klonos,* 164 Fed. 529; *United States* v. *Brookshire Oil Co.,* 242 Fed. 718.

There can be no valid location without a discovery. And while the Act of March 2, 1911, 36 Stat. 1015, recognizes that a mining claim may be sold prior to discovery, there is nothing in the act to validate a location otherwise invalid.

It is by no means clear that this act authorizes the sale of more than 20 acres to a single individual, and in no event does it apply to an invalid location or to lands which at the time of the inception of development were withdrawn from mineral entry.

To say that a corporation or a single individual may acquire by transfer prior to discovery any number of mining claims, irrespective of the area they contain, is to nullify that provision of the placer law which limits the claim to 20 acres to a single individual.

That all the locators, including the Gulf Refining Company, had knowledge of the fraudulent character of this location is plainly apparent from the record. It is therefore submitted that none of them can claim to be innocent trespassers.

The United States, with respect to the measure of damages, is not bound by the state law or decisions.

It is well settled that the United States is not bound by state statutes of limitation; and if the Government sues and a balance is found in favor of the defendant, no judgment can be rendered against the United States either for such balance or in any case for costs. *United States* v. *Thompson,* 98 U. S. 486.

It has also been held that the statute of a State requiring landowners to fence their lands does not apply to the United States; that the Federal Constitution has delegated to Congress without limitation the power to dispose of and make all needful rules and regulations concerning the public domain; and that the exercise of that power cannot be restricted or embarrassed in any degree by state legislation. *Shannon* v. *United States,* 160 Fed.

870. See also, *Utah Power & Light Co.* v. *United States,* 243 U. S. 389.

Such being the law, no reason appears why the Government should be bound by such laws in fixing the measure of damages for trespasses on its public lands.

In *Woodenware Co.* v. *United States,* 106 U. S. 432, it is said that in the case of a wilful trespass the trespasser is liable for the full value of the property taken without allowance for expenditures made by him. The *Woodenware Case* arose in Wisconsin, and this Court referred to the milder rule in that State, which it did not see fit to follow, but followed the rule prevailing generally in this country and in England. Moreover, it is not entirely clear that the rule in Louisiana is what the appellants claim it to be. They rely upon the decision of this Court in *Jackson* v. *Ludeling,* 99 U. S. 513, in which it was held that parties in possession of a railroad under fraudulent foreclosure proceedings were entitled to be reimbursed for money spent in repairing the road and restoring it to its former condition under Art. 2314 of the Code.

That rule has no application here, because the money spent in exploring for oil was not expended in the preservation of the land.

In *Jackson* v. *Ludeling, supra,* the Court referred to a series of cases in which it was held by the Supreme Court of Louisiana that a person without title going into possession of the public lands of the United States cannot set up a claim for improvements against the Government. See *Hollon* v. *Sapp,* 4 La. Ann. 519.

There was no error in allowing interest from the date of the master's report. *Jones* v. *United States,* 258 U. S. 40.

Mr. Justice Sutherland delivered the opinion of the Court.

These cases, involving the same questions, were consolidated for trial in the District Court as well as for hear-

ing on appeal in the Circuit Court of Appeals and argued together here.

The United States, as plaintiff, brought separate suits in equity in the United States District Court for the Western District of Louisiana against the several groups of appellants (defendants in the bills) to have its title to various parcels of land confirmed, possession thereof restored, defendants enjoined from setting up claims thereto, extracting oil or other minerals therefrom, or going upon or in any manner using the same. There was in addition a prayer for an accounting in respect of the oil and gas removed from the lands by the defendants. The cases were referred to a master, and upon his report the District Court entered decrees in favor of the plaintiff in all the cases, from which appeals were taken by defendants and cross appeals by plaintiff to the Circuit Court of Appeals. That court affirmed the decrees generally but reversed the trial court in so far as it had allowed drilling and operating costs as a credit against the value of the oil extracted and converted by the defendants respectively. 273 Fed. 135, 142. The cases come here by appeal.

The lands in question were public lands of the United States and the only claim thereto asserted by the defendants was based upon locations purporting to have been made under the mining laws. The lands were withdrawn on December 15, 1908, by an executive order which reads:

" To conserve the public interests, and, in aid of such legislation as may hereafter be proposed or recommended, the public lands in Townships 15 to 23 North, and Ranges 10 to 16 West, Louisiana Meridian, Natchitoches Land Office, Louisiana, are, subject to existing valid claims, withdrawn from settlement and entry, or other form of appropriation." ·

After the promulgation of this order, at various times, mining locations were made upon the several parcels of

land by the respective groups of defendants or persons in privity with them. These locations, it will be assumed for the purposes of the case, complied with the requirements of the laws relating to the acquisition of mining rights. Before the locations were made the question had been submitted by some of the defendants to counsel learned in the law who advised that the President was without authority to make the withdrawal and that the order, in any event, did not include appropriations of lands valuable for their deposits of mineral substances. All the locations, it is claimed, were made by the defendants in the honest belief that the order not only was made without authority but that it did not purport to preclude appropriations under the mining laws.

Whatever legitimate doubts existed at the time of the locations respecting the validity of the executive order, were resolved by the subsequent decision of this Court in *United States* v. *Midwest Oil Co.*, 236 U. S. 459, where it was held that a similar order, issued in 1909, was within the power of the executive. Upon the authority of that case the order here in question must be held valid.

Passing this, it is insisted that the order does not apply to the cases here presented. The point sought to be made rests upon the rule of statutory construction that words may be so associated as to qualify the meaning which they would have standing apart. Here, it is said, the general words of the order " or other form of appropriation " must be read in connection with the specific words " settlement and entry " immediately preceding, and that so read they must be restricted to appropriations of a similar kind with those specifically enumerated. The words " settlement and entry ", it is said, apply only to the act of settling upon the soil and making entry at a land office, as, for example, under the homestead laws; that mining lands are acquired, not by settlement or entry, but by location and development; and that this

process is not covered by the words " other form of appropriation," limited, as they must be, by the associated specific words, to those forms of appropriation which are akin to-a settlement and entry. The rule is one well established and frequently invoked,-but it is, after all, a rule of *construction,* to be resorted to only as an aid to the ascertainment of the meaning of doubtful words and phrases, and not to control or limit their meaning contrary to the true intent. It cannot be employed to render general words meaningless, since that would be to disregard the primary rules, that effect should be given to every part of a statute, if legitimately possible, and that the words of a statute or other document are to be taken according to their natural meaning. Here the supposed specific words are sufficiently comprehensive to exhaust the genus and leave nothing essentially similar upon which the general words may operate. See *United States* v. *Mescall,* 215 U. S. 26; *Danciger* v. *Cooley,* 248 U. S. 319, 326; *Higler* v. *People,* 44 Mich. 299; *United States* v. *First National Bank,* 190 Fed. 336, 344. If the appropriation of mineral lands by location and development be not akin to settlement and entry, what other form of appropriation can be so characterized? None has been suggested and we can think of none. A purchase of land or an appropriation for railroad uses or rights of way, if not actually involving settlement and entry, is no more akin to that method than an appropriation for mining purposes. Reasons which, under the rule, would justify the exclusion of one from the operation of the general words would equally justify the exclusion of all. It would therefore result, there being nothing *ejusdem generis,* that the application of the rule contended for would nullify the general words altogether. Moreover, the circumstances leading up to and accompanying the issuance of the order demonstrate conclusively that its main, if not its only, purpose was to preserve from private appro-

priation the oil and gas which the lands were thought to contain pending investigation and congressional action, and this purpose would have been subverted by appropriations of the nature here involved quite as much as by other forms. We conclude, therefore, that the mining locations here relied upon fell clearly within the withdrawal order and consequently were prohibited by it.

The trial court so decided; but, following the report of the master, held that these locations were made in moral good faith, and that under the laws of Louisiana, where the lands are situated, the defendants were liable only for the value of the oil after deducting therefrom the cost of drilling, equipping and operating the wells, through and by means of which the oil was extracted. It was to reverse this latter holding that the cross appeals were prosecuted. The Circuit Court of Appeals reversed the District Court in this particular upon the ground that the defendants' mistake, if any, was one of law, and constituted no excuse, and that the Louisiana law could have no application since the suit was one in equity, to be governed by general principles and not by local laws or rules of decision.

Whether the defendants were innocent trespassers within the principles of the common law we find it unnecessary to determine. That the measure of damages applied by the District Court was in consonance with the statute law of Louisiana as interpreted by the highest court of that State is clear. The Louisiana Civil Code (Article 501), in terms provides that the "fruits produced by the thing belong to its owner, although they may have been produced by the work and labor of the third person . . . on the owner's reimbursing such person his expenses." This provision is taken substantially from Article 548 of the Code Napoleon, respecting which, Laurent, a distinguished commentator, says: "This is a principle of equity which will not permit the

owner to enrich himself at the expense of another, even though he be in bad faith. This applies to all the expenses to which the possessor has been subjected." *Martel* v. *Jennings-Heywood Oil Syndicate,* 114 La. 351, 359. The decisions of the Supreme Court of Louisiana have settled the rule that under the provisions of this article of the Louisiana Civil Code, in awarding damages to the owner of property from which oil has been extracted the cost of production must be first deducted from the value of the oil produced, even though the defendant went into possession in technical bad faith, but in moral good faith. *Cooke* v. *Gulf Refining Co.,* 135 La. 609, 618, and cases cited.

The defendants here, it is true, took possession of the lands in violation of the withdrawal order, but they did so in the honest, though mistaken, belief that the order was wholly without authority. Some of them had legal advice from competent counsel to that effect. It is common knowledge that the validity of the withdrawal order in question, as well as the later order of 1909, was in grave doubt until the decision of this Court in *United States* v. *Midwest Oil Co., supra.* Not only was a substantial opinion to be found among members of the profession that the order was invalid, but the decision here was by a divided court. In view of these circumstances, we think it fair to conclude that the mining locations by defendants and the occupation and use of the lands thereunder were in moral good faith, within the meaning of the Louisiana Code and decisions. *New Orleans* v. *Gaines,* 131 U. S. 191, 218. The Circuit Court of Appeals suggested doubts respecting the honesty of defendants' motives in seeking or in acting upon advice of counsel; but we cannot ignore the finding of the master explicitly to the effect that the locators proceeded in " moral good faith." His finding was made after hearing and seeing the witnesses and, having support in the evidence, will be accepted here. See *Adamson* v. *Gilliland,* 242 U. S. 350, 353.

The Norvell case is sought to be distinguished from the others. It appears that the location covered one hundred and sixty acres and was made by an association of eight persons. The lands were leased to the Gulf Refining Company upon the same day in pursuance of an understanding had prior to the location. But there is nothing in the federal mining laws which renders such a transaction fraudulent, and a careful reading of the evidence discloses nothing in the circumstances which would make the Louisiana statute as to the measure of damages inapplicable.

Was the lower court right in its conclusion that the Louisiana law was not applicable in an equity suit?

Subject to certain exceptions, the statutes of a State are binding upon the federal courts sitting within the State, as they are upon the state courts. One of the exceptions is that these statutes may not be permitted to enlarge or diminish the federal equity jurisdiction. *Mississippi Mills* v. *Cohn,* 150 U. S. 202. That jurisdiction is conferred by the Constitution and laws of the United States and must be the same in all the States. *Neves* v. *Scott,* 13 How. 268. But while the power of the courts of the United States to entertain suits in equity and to decide them cannot be abridged by state legislation, the rights involved therein may be the proper subject of such legislation. See *Missouri, Kansas & Texas Trust Co.* v. *Krumseig,* 172 U. S. 351, 358. In *Brine* v. *Insurance Co.,* 96 U. S. 627, 639, this Court said:

"We are not insensible to the fact that the industry of counsel has been rewarded by finding cases even in this court in which the proposition that the rules of practice of the Federal courts in suits in equity cannot be controlled by the laws of the States, is expressed in terms so emphatic and so general as to seem to justify the inference here urged upon us. But we do not find that it has been decided in any case that this principle has been carried so far as to deny to a party in those courts substantial rights

conferred by the statute of a State, or to add to or take
from a contract that which is made a part of it by the law
of the State, except where the law impairs the obligation
of a contract previously made."

See, also, *Independent District of Pella* v. *Beard,* 83
Fed. 5, 13, where it is said:

" It is undoubtedly true that the United States courts
sitting as courts of equity have a freedom of action in this
respect which they do not possess as courts of common
law, and that, as a general proposition, the equity juris-
diction of the federal courts cannot be limited or re-
strained by a state. *Green* v. *Creighton,* 23 How. 90;
*Payne* v. *Hook,* 7 Wall. 430; *Ridings* v. *Johnson,* 128 U. S.
212; *Mississippi Mills* v. *Cohn,* 150 U. S. 202. But these
decisions relate to the practice, the impairing of jurisdic-
tion, rather than to the determination of the rights of par-
ties after jurisdiction has been acquired."

Here, while the suit is one in equity, the statute and de-
cisions relied upon have nothing to do with the general
principles of equity or with the federal equity jurisdic-
tion, but simply establish a measure of damages applica-
ble alike to actions at law and suits in equity. The case
presented by the bills is primarily one involving title to
land and seeking an injunction against continuing tres-
passes. The conversion of the oil, for which damages are
sought, is incidental and dependent. The entire cause of
action is therefore, local (*Ellenwood* v. *Marietta Chair
Co.,* 158 U. S. 105), and the matter of damages within the
controlling scope of state legislation. See *Mullins Lum-
ber Co.* v. *Williamson & Brown Land & Lumber Co.,* 255
Fed. 645, 647. The enforcement of such a statute in an
equity suit in no manner trammels or impairs the equity
jurisdiction of the national courts.

It was urged upon the argument that § 721 of the Re-
vised Statutes, which provides that the laws of the several
States shall be regarded as rules of decision in trials *at
common law* in the courts of the United States, by impli-

cation excludes such laws as rules of decision in equity suits. The statute, however, is merely declarative of the rule which would exist in the absence of the statute. *Bank of Hamilton* v. *Lessee of Ambrose Dudley, Jr.,* 2 Pet. 492, 525; *Bergman* v. *Bly,* 66 Fed. 40, 43. And it is not to be narrowed because of an affirmative legislative recognition in terms less broad than the rule. The rule that an affirmative statute, without a negative express or implied, does not take away the common law (Potter's Dwarris, 68; Sedgwick Statutory Construction, 29, 30) affords an analogy. See *Bailey* v. *Commonwealth,* 11 Bush. (Ky.) 688, 691; *Johnston* v. *Straus,* 26 Fed. 57, 69.

There are numerous cases, both in this Court and in the lower federal courts, where the rule has been applied in suits in equity, and while § 721 was not mentioned, it is scarcely possible that it was overlooked. See, for example, *Jackson* v. *Ludeling,* 99 U. S. 513, 519, a suit in equity, where this Court held that a law of Louisiana based upon the civil law, relating to the measure of damages, was controlling. The law there involved was Article 2314 of the Civil Code, which provides:

"He to whom property is restored must refund to the person who possessed it, even in bad faith, all he had necessarily expended for the preservation of the property."

The general purpose and principle of that provision and of the provision which is relied upon in the instant case are the same.

The defendants in some of the cases enumerated in the title complain of the action of the master and the District Court in charging against them various sums paid to codefendants as royalties, notwithstanding the fact that the cost of drilling, equipping and operating the wells exceeded the value of the oil extracted, or that the exaction was in addition to the value after deducting such cost. These royalties arose from and were paid out of proceeds of the oil; but this oil belonged to the plaintiff as owner of the property from which it had been taken. The de-

fendants who received the royalties were obviously not entitled to retain them, and having incurred no expense in connection with the mining operations, were liable for the entire amount and the defendants who paid the royalties were jointly liable as co-wrongdoers. A joint judgment against all was therefore proper. In the Mason case, however, the net value of the oil extracted exceeded in amount the royalties paid. The gross value was $67,732.94, the drilling and operating cost was $34,067.13, which, being deducted, left the net value of $33,665.81. Royalties were paid by the producer, the Gulf Refining Company, to its co-defendants, amounting to $11,294.20. The master found and the District Court held that the Gulf Refining Company was liable for the $33,665.81, and that the recipients of the royalties and the Gulf Refining Company were liable *in solido* for the additional sum of $11,294.20, making the total judgment $44,960.01. We think this was erroneous. For reasons already stated, plaintiff was entitled to recover the amount of the royalties without deduction in any event, but it was not entitled to recover them twice and this is clearly the effect of the decree, the amount of which should be reduced to $33,665.81.

The District Court reserved the question of the adjustment of equities among the several defendants in respect of the royalties and no doubt an opportunity will be afforded by that court for its presentation and consideration. As to the rights of the respective defendants in that matter, however, we express no opinion.

> *The decrees of the Circuit Court of Appeals are reversed and those of the District Court are affirmed in all the cases except that the decree in the Mason case is modified by reducing the amount to $33,665.81— $22,371.61 against the Gulf Refining Company and $11,294.20 against that defendant and the respective royalty recipients in solido—and as so modified, it is affirmed.*